UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED TECHNOLOGIES CORPORATION, acting through its Pratt & Whitney division,<br><br>*Plaintiff*,<br><br>v.<br><br>A&P ALLOYS, INC. and JOHN J. PALIE, JR.,<br><br>*Defendants*. | Civil Action No.  14-13545 |

## COMPLAINT AND JURY DEMAND

Plaintiff United Technologies Corporation, acting through its Pratt & Whitney division ("Pratt & Whitney"), brings this action against defendants A&P Alloys, Inc. ("A&P"), a metallic raw materials supplier, and John J. Palie, Jr. ("Palie," and together with A&P, "Defendants"), its sole shareholder, director and officer, for multiple damages and attorneys' fees arising from Defendants' fraudulent misrepresentations about the quality and source of metals sold for ultimate use by Pratt & Whitney, as well as Defendants' attempts to impede Pratt & Whitney's efforts to uncover their misconduct.  Knowing that A&P's material was to be used by Pratt & Whitney primarily in the manufacture of turbofan engines, including for fighter jets purchased by the United States Armed Forces, A&P intentionally submitted certifications falsely representing the pedigree and quality of its material as compliant with Pratt & Whitney's exacting requirements.  In fact, the A&P material could not have come from the source originally identified in A&P's certifications.

## PARTIES

1. Pratt & Whitney is a division of United Technologies Corporation, a Delaware Corporation, with a usual place of business at 400 Main Street, East Hartford, Connecticut. Pratt & Whitney is engaged in the design, manufacture, and service of aircraft engines and auxiliary power units for commercial and military applications.

2. A&P Alloys, Inc., also known as A and P Alloys, Inc., is a Massachusetts corporation with a usual place of business at 400 West Street, West Bridgewater, Massachusetts. On information and belief, A&P is primarily engaged in the sale of metal stock. A&P has been in operation since 1965.

3. John J. Palie, Jr., is the sole shareholder, officer, and director of A&P and is a resident of Rhode Island.

## JURISDICTION AND VENUE

4. This Court has Subject Matter Jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

5. Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to this claim occurred in the District of Massachusetts.

## FACTUAL BACKGROUND

**Pratt & Whitney Acquires Titanium and Other Materials from A&P.**

6. Pratt & Whitney is a world leader in the design, manufacture, and service of aircraft engines and auxiliary power units. Pratt & Whitney manufactures engines for the U.S. Armed Forces' front line fighter aircraft, including the F100 engine powering the F-15 Eagle and F-16 Fighting Falcon, the F119 engine powering the F-22 Raptor, and the F135 engine powering

the F-35 Lightning II. Pratt & Whitney's large commercial engines power more than 25 percent of the world's mainline passenger fleet.

7. Each of the engines Pratt & Whitney manufactures contains thousands of individually machined parts, sourced by Pratt & Whitney from hundreds of specialized machine shops throughout the United States. Due to the nature of these engines and their use, Pratt & Whitney promulgates and enforces rigorous quality standards. In addition, government contracting requirements applicable to many Pratt & Whitney products necessitate that Pratt & Whitney have full and accurate information regarding the source or "pedigree" of all material supplied by its subcontractors. In part, Pratt & Whitney ensures the quality of components used to manufacture its engines through its Laboratory Control at Source ("LCS") program. Under this program, LCS-qualified suppliers enforce Pratt & Whitney's standards and specifications when they purchase materials from their own subcontractors. Pratt & Whitney then accepts finished material from these LCS-qualified suppliers without further testing. In order to be LCS-qualified, a supplier must meet Pratt & Whitney requirements, including training requirements, and be subject to evaluation and surveillance by Pratt & Whitney.

8. Lewis Machine, LLC ("Lewis") is an LCS-qualified machined finished part supplier of approximately 100 different metallic machined parts to Pratt & Whitney.

9. Many of the parts provided by Lewis were made of titanium. The process of titanium fabrication begins at a mill where ore, alloy additives, and, in some instances, scrap are melted together in an industrial furnace to form a cylinder weighing thousands of pounds. This cylinder, called an ingot, is then forged into large bar shapes called billets. The process of converting the size and shape of the material involves mechanical work referred to as "working." Other processors, called converters, forge (*i.e.*, "work") the billet into useful

shapes, in this case smaller bars, called bar stock. Throughout the various stages of the fabrication process, the titanium is traceable by use of a "Heat" number that identifies the particular ingot from which the resulting bar stock originated.

10. In response to Pratt & Whitney purchase orders for finished parts, Lewis would send its own purchase orders to A&P for metal stock. Lewis purchase orders state that the material was "for PWA [Pratt & Whitney Aircraft] end use" or use equivalent language. Many orders also state, "complete certifications required" or that "ASQR-01 & PWA300 Apply." ASQR-01 is a well-known industry acronym for United Technologies Corporation's "Aerospace Supplier Quality Requirements." PWA300 is a Pratt & Whitney standard that defines the requirements for testing and other controls of materials, processes, and parts supplied by and to Pratt & Whitney, as well as certain approval and qualification procedures for outside suppliers.

11. Many Lewis purchase orders issued to A&P explicitly provide for a "Right of Access" by Lewis, Pratt & Whitney, and government authorities "to all [A&P] facilities involved in the order and to all [A&P] records."

12. A&P would subsequently deliver the metal stock to Lewis. As part of the obligations imposed on Lewis by Pratt & Whitney, Lewis requested, and A&P provided, certifications tracing the material by Heat number through the various stages of processing from ingot to bar. Pursuant to Pratt & Whitney requirements, Lewis would submit a sample of the metal stock (raw material) to an independent laboratory for metallurgical and mechanical testing for conformity with the specification requirements. If the material passed the required independent laboratory tests, Lewis could then machine it into finished parts that would be delivered to Pratt & Whitney. In accordance with Pratt & Whitney's LCS system, subsequent

shipments of the same size, source, and Heat as previously tested material would be accepted by Lewis and delivered to Pratt & Whitney without additional independent testing.

**Lewis and Pratt & Whitney Discover that A&P's Certifications are False.**

13.     In or about October 2013, Lewis's Certified LCS Representative requested that Pratt & Whitney permit it to accept a shipment of 398 pieces of A&P titanium bearing incomplete documentation regarding the traceability of the conversion from ingot to bar. Pratt & Whitney informed Lewis that it would not accept the material, and Lewis returned it to A&P.

14.     In early 2014, similar incomplete documentation was identified accompanying a May 2013 A&P shipment to Lewis of 308 pieces of titanium bar stock identified as Heat 8714354 melted at RTI International Metals, Inc. ("RTI"), a U.S.-based specialty metals mill that melts raw materials into ingot. Lewis was in the process of machining this titanium into parts for Pratt & Whitney's use in the F135 engine.

15.     At Pratt & Whitney's instruction, Lewis was required to send the material to an independent testing laboratory; the material ultimately failed to meet the applicable industry standard. Under Pratt & Whitney procedures, after such test failures, the material may only be accepted if it goes through an individualized engineering quality review.

16.     In preparation for that review, Pratt & Whitney reviewed documents reflecting that the chemical properties found in these tests differed from the initial results Lewis received when it tested samples from the first shipment of Heat 8714354. Pratt & Whitney sought to understand the differences in the results from the initial tests versus those from 2014 on what A&P purported was the same material. As part of this process, Pratt & Whitney requested that

Lewis obtain from A&P all certifications and documentation for the material relating to Heat 8714354 including all processing and treatments to which it had been subjected.

17. On the afternoon of May 28, 2014, Pratt & Whitney obtained information indicating that some, but not all, of the material had been processed at Valley Forge LLC ("Valley Forge"), a converter that works billet into bar stock. Pratt & Whitney then spoke with a Quality Control Manager at Valley Forge and requested complete documentation regarding its processing of this titanium. The Quality Control Manager stated that she would provide the information by the end of the day and noted that A&P had just asked her to provide documentation reflecting that the material processed had come from Heat 8714354.

18. That evening, Pratt & Whitney still had not received a complete set of documents from A&P despite making requests by email and telephone. Pratt & Whitney and Lewis representatives spoke via conference call with either Palie or his son John Palie III (it was not entirely clear to those on the telephone which one was speaking on behalf of A&P), regarding the need for this essential documentation. This individual provided no substantive responses to Pratt & Whitney's questions and, in response to a comment that Valley Forge was about to provide further documentation that would have helped Pratt & Whitney establish the pedigree of the material, stated that he would not permit Pratt & Whitney to obtain information from his vendor Valley Forge. In response, a Pratt & Whitney employee asked whether he understood that he was making the situation very difficult for Pratt & Whitney, his customer. A&P's representative had no response. Nor would he provide any estimate of when A&P would provide the documentation that Pratt & Whitney requested.

19. The next morning, and reflecting the urgency of the situation, a Pratt & Whitney representative and the President of Lewis traveled to A&P's headquarters in West Bridgewater,

Massachusetts to obtain the requested documentation. They emailed A&P prior to arriving; A&P sent a reply email indicating that they were not welcome. Palie, who appeared to be waiting in his car for their arrival, met them in A&P's parking lot and refused to permit access to the facility or to turn over the requested records despite being reminded that the purchase orders granted both Pratt & Whitney and Lewis these rights.

20. That evening, A&P provided new documentation, the accuracy of which Palie confirmed, relating to Lewis Purchase Order 43782, consisting of 900 pieces of titanium and including the 308 pieces delivered to Lewis in May 2013. This new documentation indicated that only 60 pieces of material were derived from RTI Heat 8714354; the remainder of the material – 840 pieces – was originally melted at a Russian mill. This documentation directly conflicts with the certifications A&P initially provided with the material and, therefore, calls into question the source and quality of all A&P material. Moreover, because Federal law prohibits the Department of Defense, subject to certain enumerated exceptions, from purchasing material containing foreign-sourced titanium, including titanium from Russia, A&P, a long-time supplier of titanium, knew or should have known that accurate information about the source of titanium is critical. Despite repeated subsequent requests, Defendants have refused to provide further information.

21. Pratt & Whitney then contacted Valley Forge to follow up on their earlier discussion. Although she had previously been cooperative, the Valley Forge representative stated that her company had been instructed by A&P not to share any information with Pratt & Whitney. By ordering Valley Forge not to cooperate, Defendants intentionally sought to frustrate Pratt & Whitney's attempt to learn the facts behind A&P's supplying of titanium.

22.     Pratt & Whitney also contacted RTI to inquire about Heat 8714354.  RTI informed Pratt & Whitney that it sold all of the material in this Heat to two companies, each of which confirmed that it had used substantially all of the material to make parts for their respective customers and none had been sold to A&P.  Therefore, both A&P's initial representation that it had obtained and sold thousands of pounds of titanium traceable to Heat 8714354 for use by Pratt & Whitney, and Palie's later representation that a substantial portion of this material was traceable to that Heat, were false.

23.     Pratt & Whitney has since evaluated various samples of A&P material, and some have evidenced non-conforming properties that suggest that the material supplied by A&P has been sourced from multiple different Heats and that such material may not have received sufficient mechanical working to ensure its compliance with applicable specifications.  However, Pratt & Whitney's rigorous evaluation to date of both the A&P material and the particular parts in which it has been utilized has determined that such material does not pose a risk to safety of flight.

24.     Pratt & Whitney has reviewed and attempted to verify all of the certifications provided by A&P to any of Pratt & Whitney's suppliers.  This review, which is ongoing, has revealed widespread inconsistencies and misstatements in the A&P certifications.  These false statements were not just limited to titanium but included A&P's shipments of other materials and extend to other suppliers beyond Lewis.

**Pratt & Whitney Spends Over $1 Million to Remedy the Damage Caused by Defendants' Fraud.**

25.     Pratt & Whitney's reliance on A&P's false representations relating to the quality and pedigree of its material has required Pratt & Whitney to undertake extensive and costly

remedial efforts with respect to parts machined from that material in order to ensure the integrity and quality of Pratt & Whitney product including, without limitation, expedited material review and engineering analysis.

26. For example, Pratt & Whitney issued a "Quality Hold" for engine assemblies and deliveries containing parts known to have originated with A&P materials, meaning that Pratt & Whitney impounded the shipment of any product containing such parts until the suspect parts were removed and replaced with alternately-sourced parts or were validated through mechanical testing. Pratt & Whitney has performed extensive testing or analysis on such parts, removed and replaced those parts where prudent, and developed alternate sources of supply.

27. Pratt & Whitney has issued an industry-wide alert regarding A&P's suspect material through an information sharing system for government contractors and purchasers known as the Government Industry Data Exchange Program and has begun a survey of all of its suppliers seeking information relating to A&P materials used in Pratt & Whitney products. Pratt & Whitney has also reported A&P's misconduct to the appropriate government agencies.

28. These remediation efforts have cumulatively cost Pratt & Whitney over $1 Million to date. These costs will only increase as Pratt & Whitney continues to investigate the extent of A&P's fraud.

## COUNT I
## (Fraud)
## (Against A&P and Palie)

29. The allegations contained in the preceding paragraphs are herein repeated and incorporated herein by reference.

30. A&P knowingly made misrepresentations of material fact with the intention to induce Pratt & Whitney by (a) providing false and inconsistent material certifications along with shipments of material knowingly destined for Pratt & Whitney, and (b) confirming the accuracy of the documentation presented on May 29, 2014 that could not possibly have been true.

31. Palie knowingly made misrepresentations of material fact with the intention to induce Pratt & Whitney by confirming the accuracy of the documentation presented on May 29, 2014 that could not possibly have been true.

32. Pratt & Whitney acted in reliance on Defendants' statements by accepting the parts made with A&P provided material and by delaying its response and remediation efforts.

33. As a result of Defendants' fraud, Pratt & Whitney has been and will continue to be damaged.

## COUNT II
### (Negligent Misrepresentation)
### (Against A&P and Palie)

34. The allegations contained in the preceding paragraphs are herein repeated and incorporated herein by reference.

35. In the course of their business, by failing to exercise reasonable care or competence in obtaining or communicating information, Defendants supplied false information for the guidance of and use by Pratt & Whitney regarding the pedigree of material supplied.

36. Defendants intended that the information was for Pratt & Whitney's benefit, guidance, or use, and knew that Pratt & Whitney would be influenced by the information and/or Defendants knew that Lewis intended to supply the information to Pratt & Whitney for its

benefit, guidance, or use, and that Lewis would intend that Pratt & Whitney be influenced by the information.

37. Pratt & Whitney justifiably relied upon the information supplied by Defendants.

38. As a result of Defendants' misrepresentations, Pratt & Whitney has been and will continue to be damaged.

## COUNT III
### (Breach of Contract)
### (Against A&P)

39. The allegations contained in the preceding paragraphs are herein repeated and incorporated herein by reference.

40. Pratt & Whitney was an intended third-party beneficiary of the Purchase Orders between Lewis and A&P, because (a) recognition of such a right on Pratt & Whitney's part is appropriate to effectuate the intention of the parties, and (b) the circumstances indicate that A&P intended to give Pratt & Whitney the benefit of its promised performance.  In particular, the language of the purchase orders and operation of the LCS program make clear that the benefit of A&P's promise to (a) comply with applicable specifications including, but not limited to, ASQR-01 and PWA300, and (b) provide accurate documents, records, and access to facilities, flowed directly to and was intended to benefit Pratt & Whitney.

41. A&P breached the purchase orders by failing to deliver material in compliance with the requirements of those contracts and by submitting false material certifications.

42. A&P breached the purchase orders by refusing access to its facilities and records when requested by Pratt & Whitney.

43. As a result of A&P's breach, Pratt & Whitney has been and will continue to be harmed.

**COUNT IV**
**(Violation of Chapter 93A)**
**(Against A&P and Palie)**

44. The allegations contained in the preceding paragraphs are repeated and incorporated herein by reference.

45. Defendants are engaged in trade or commerce within Massachusetts in accordance with Chapter 93A of the Massachusetts General Laws.

46. Defendants' misconduct, including the provision of false certifications, refusal to provide accurate information, refusal to grant access to facilities, and instruction to third-parties to deny Pratt & Whitney accurate information, was committed primarily and substantially in Massachusetts.

47. These actions were unfair and deceptive acts or practices in violation of Sections 2 and 11 of Chapter 93A, and were willful and knowing violations, subjecting Defendants to multiple damages and attorneys' fees.

48. Defendants' actions in violation of Chapter 93A have caused, and will continue to cause, Pratt & Whitney to incur the loss of money or property.

WHEREFORE, Plaintiff Pratt & Whitney respectfully requests that the Court:

(a) Enter judgment against A&P and Palie for fraud in an amount to be determined at trial;

(b) Enter judgment against A&P and Palie for negligent misrepresentation in an amount to be determined at trial;

(c) Enter judgment against A&P for breach of contract in an amount to be determined at trial;

(d) Enter judgment against A&P and Palie for violation of Chapter 93A, awarding multiple damages plus attorneys' fees, interest, and costs; and

(e) Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff Pratt & Whitney hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

UNITED TECHNOLOGIES CORPORATION, acting through its Pratt & Whitney division,

By its attorneys,

/s/ Jonathan I. Handler
Jonathan I. Handler (BBO #561475)
jihandler@daypitney.com
David W.S. Lieberman (BBO #673803)
dlieberman@daypitney.com
DAY PITNEY LLP
One International Place
Boston, MA 02110
T:  (617) 345-4600
F:  (617) 345-4745

Dated: August 29, 2014